UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 25-cr-29-JGK

UNITED STATES OF AMERICA,

     Plaintiff,

v.

GINA GUY

and

ROSANNA LISA STANLEY,

     Defendants.

_____/

**DEFENDANTS' MOTION FOR *IN CAMERA* REVIEW AND
DISCLOSURE OF GRAND JURY MINUTES
AND INCORPORATED MEMORANDUM OF LAW**

The Defendants, **GINA GUY** ("Guy"), and **ROSANNA LISA STANLEY**

("Stanley") through undersigned counsel, respectfully move this Court,[1] pursuant to

Fed.R.Crim.P. 6(e)(3)(E)(ii), for an *in camera* review and disclosure of grand jury

minutes because grounds may exist to dismiss the indictment [DE30] based on

_____

[1] While Guy and Stanley previously provided the Court and the parties with an unredacted copy of the instant motion and exhibits to be filed under seal on January 15, 2026 because the challenged affidavits in support of the search warrants constitute disclosure materials under the Court's protective order issued on February 27, 2025 [DE45], the Government on February 5, 2026 agreed in writing that the motion could be filed via the ECF system but that the subject affidavits identified herein as Exhibit A and B would remain under seal.

1

matters that occurred before the grand jury.

## I.    Legal standards governing *in camera* review and disclosure of grand jury minutes

Rule 6(e)(3)(E)(ii) of the Federal Rules of Criminal Procedure allows for disclosure "at the request of the defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii).[2] In order to invoke disclosure under this Rule, "a defendant must demonstrate some grossly prejudicial irregularity or some other particularized need[3] or compelling necessity" that outweighs the Government's and the Grand Jury's substantial interest in secrecy. *United States v. Gibson*, 175 F. Supp. 2d 532, 534 (S.D.N.Y. 2001); *see also United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 443, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983). "This standard applies both to in camera review and disclosure to the parties of grand jury minutes." *United States v. Dunn*, No. 05-CR-127 (KMK), 2005 WL 1705303, at *1 (S.D.N.Y. July 19, 2005).

*United States v. Helbrans*, 547 F.Supp.3d 409, 434 (S.D.N.Y.2021). *Accord*

*Douglas Oil Company of California v. Petrol Stops Northwest*, 441 U.S. 211, 222

---

[2] "Rule 6(e) does not apply to disclosures of information obtained independently of the grand jury process, even if the same information might later be presented to the grand jury. This includes information produced by a criminal investigation that parallels but is independent of a grand jury investigation." *United States v. Skelos*, 2015 WL 6159326, at *10 (S.D.N.Y.)

[3] Particularized need includes "the use of the grand jury transcript at the trial to impeach a witness, to refresh his recollection, to test his credibility and the like." *United States v. Procter & Gamble Company,* 356 U.S. 677, 683 (1958). *See also De Binder v. United States*, 292 F.2d 737, 739 (D.C. Cir. 1961) (determining that defendant met burden for inspection of grand jury minutes where "ample ground" existed for "suspicion" of "inconsistencies" between grand jury and trial testimony of prosecution's "sole, key, eyewitness").

(1979) (A party demonstrates a particularized need by proving "that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed."). "A review of grand jury minutes should not be permitted without concrete allegations of Government misconduct." *United States v. Leung*, 40 F.3d 577, 582 (2nd Cir. 1994). *See*, *e.g.*, *United States v. Naegele*, 474 F.Supp.2d 9, 10–11 (D.D.C. 2007) (allowing inspection of grand jury minutes because government misled the grand jury about the existence of a page of a document that had been the basis for "[a]t least five counts of the original eleven-count indictment"). "A defendant is [also] entitled to disclosure of grand jury testimony that constitutes *Jencks*, *Brady* or *Giglio* material." *United States v. Shun*, 2021 WL 3778932, *7 (W.D.N.Y.2021).

## II. Facts underlying request for *in camera* review of grand jury minutes

In an affidavit in support of a seizure warrant *in rem* for a Santander Bank account jointly-held by Guy and an alleged victim authored by FBI Special Agent Richard Smythe ("Smythe") on March 27, 2024 (24 MAG 1267),[4] Smythe indicated his "familiar[ity] with a type of fraudulent scheme known as 'pig

---

[4] Attached as composite Exhibit A is a copy of that affidavit, as well as the seizure warrant (24 MAG 1267), for the Court's review in connection with this motion. *See* Government Discovery Production Documents (with Bates numbers USAO_0000130-148).

butchering.' " He described that scheme as follows:

24. In a typical pig butchering scam, the fraudsters spend time speaking to and getting to know their victims to gain those victims' confidence. There are different ways fraudsters gain that confidence. One example is what is known as a "romance scam," where, as here, the fraudsters present themselves as romantically interested in their victims.

25. After developing a relationship and gaining their victims' trust, the fraudsters make false representations about the need for money and instruct their victims to transfer funds from their bank accounts to the fraudsters' bank accounts, provide the fraudsters with cash, and/or write checks issued in the fraudsters' names. The fraudsters entice their victims into making these investments by leveraging the trust and confidence that the fraudsters have cultivated with their victims. In a pig butchering scheme perpetrated through "romance scams," the beneficiary accounts receiving the victims' monies are held or controlled by individuals who have perpetrated the fraud scheme. To obfuscate the origins of the illicit criminal proceeds and to stay ahead of law enforcement, the fraudsters typically move the monies through several accounts until the illicit monies settle into accounts that can be used for their personal benefit.[5]

---

[5] A seizure warrant based on Smythe's affidavit is the subject of a separately-filed motion to suppress and request for *Franks* hearing because, among other reasons, Smythe: 1) mislead the Magistrate Judge by failing to disclose that the Government seized funds from a Santander Bank account jointly-held by Guy and an allged victim 28 days prior to applying for a seizure warrant: 2) procured a seizure warrant contrary to a four-year old binding Second Circuit precedent which deemed such delay presumptively unreasonable requiring exclusion; 3) falsely alleged in the affidavit that Guy perpetuated a "romance scam;" 4) falsely alleged in the affidavit that Guy enticed the victims to make investments; and 5) falsely concluded that Guy's actions with respect to victim-1 were consistent with a "pig butchering scheme."

*See* Government Discovery Production Documents (with Bates numbers USAO_0000037).

In affidavits executed on April 24, 2024 (GPS Combo Warrant 24 MAG 1663) and June 7, 2024 (GPS Combo Warrant 24 MAG 2203) by Smythe in support of each of those search warrants,[6] he indicated that Guy and Stanley had been under investigation since on or about June 2023.[7] Although an alleged victim

---

[6] Attached as composite Exhibit B are copies of those affidavits and Orders for the Court's review in connection with this motion. *See* Government Discovery Production Documents (with Bates numbers USAO_0000151-183 and USAO_0000184-253).

[7] Prior to discussing victim #1, the affidavits provide the following general description of Smythe's investigation:

*The Target Subjects' Romance Scams*

8. Since in or about June 2023, the FBI has been investigating GINA GUY, a 37-year-old woman whose primary residence is believed to be in Manhattan, New York ("Target Subject-1"), and ROSE STANLEY, a 48-year-old woman whose primary residence is believed to be in North Miami Beach, Florida ("Target Subject-2," and together with Target Subject-1, the "Target Subjects"). As described further below, I respectfully submit that there is probable cause to believe that Target Subject-1 and Target Subject-2 have been engaging in fraudulent schemes for at least ten years. During the course of those schemes, the Target Subjects generally developed a relationship with and gained their victims' trust, made false representations about the Target Subjects' need for money, and instructed their victims to transfer funds from the victims' bank accounts to the Target Subjects' bank accounts, provide the Target Subjects with cash, and/or write checks issued in the Target Subjects' names. The Target Subjects also established beneficiary accounts to receive the victims' monies and, to obfuscate the origins of

the illicit criminal proceeds and evade detection by law enforcement, moved the monies through several accounts until the illicit monies settled into accounts that the Target Subjects used for their personal benefit.

9. Based on my review of records obtained pursuant to grand jury subpoenas from financial institutions and telephone service providers and my review of text messages and emails, as well as law enforcement reports and records, interviews with victims and witnesses, and my conversations with other law enforcement officers, I have learned the following:

a. Between approximately 2014 and the present, Target Subject-1 and Target Subject-2 have defrauded over a dozen individuals out of millions of dollars. Pursuant to the scheme developed by the Target Subjects, either Target Subject-1 or Target Subject-2 would initiate a conversation with an elderly victim in a public place, such as a grocery store, a store parking lot, or a sidewalk.

b. On many occasions, the Target Subjects would pretend to recognize the victim as someone with whom they previously had a relationship, engage the victim in conversation, exchange contact information, and express interest in staying in touch with the victim.

c. Over time, the Target Subjects would stay in communication with the victim through phone calls, emails, in-person visits to the victim's residence, and/or in-person meetings at an eatery or another public place.

d. After gaining their victims' trust, the Target Subjects would induce the victim to send money and/or things of value to the Target Subjects, including through a bank wire transfer to a bank account held by the Target Subjects, or a cashier's check, a standard bank check, cash, and/or cash equivalents.

e. On certain occasions, Target Subject-2 induced her victims to buy her expensive items, such as a Cartier ring. And, on at least one occasion, Target Subject-2 also accepted items of value, namely gold coins, from one of the victims.

is referred to as victim #1 and identified by name in those affidavits, this individual will only be identified here as victim #1. The affidavit documents approximately $170,000 in cash withdrawals from this victim's bank account (without identifying who withdrew those amounts) between 2016-17 and that Guy was listed as a beneficiary and signatory on that account in July 2020. On September 5, 2020, victim #1 passed away in San Francisco. Later that month, the bank wired

> f. Once the Target Subjects received funds from a victim, the Target Subjects either moved the money to another bank account held by the Target Subjects, withdrew large amounts of the money in cash, including from ATMs located in and around Manhattan, New York, or directly wired money from the recipient bank account to various vendors, including for the purposes of (i) paying off items such as luxury cars, a luxury boat, and a personal residence; (ii) buying luxury goods, including high-end jewelry and the like; (iii) paying for rent at multiple apartments rented by one or another of the Target Subjects in New York and New Jersey; and (iv) otherwise spending the victim's money on personal expenses of the Target Subjects.

> g. In order to induce a victim to send money to one of the Target Subjects, either Target Subject-1 or Target Subject-2 would make various false representations, including, for example, claiming to need a serious medical procedure, such as a liver or kidney transplant or surgery for a brain aneurysm, and claiming to need money to finance a business, such as a catering and dress-making business. Each of the Target Subjects also convinced many of the victims that their respective romantic relationships with each victim were exclusive relationships.

*See* Government Discovery Production Documents (with Bates numbers USAO_0000160-0000162).

approximately $100,000 to Guy as the death beneficiary. The affidavits contain no evidence of false statements or false pretenses attributable to Guy with respect to victim #1, or any other fraudulent actions by Guy which lured victim #1 to part with his funds.

On June 24, 2024, Guy and Stanley were arrested. In the Complaint filed that same day [DE1:3], the Government alleged that Guy and Stanley defrauded at least 16 "elderly and other vulnerable" unnamed victims of more than $7 million dollars from on or about 2009 through 2024.[8] However, it only generally discussed examples that: 1) Guy singularly engaged in schemes to defraud with *four* alleged unnamed victims; 2) Stanley singularly engaged in schemes to defraud with *two* alleged unnamed victims; and 3) jointly engaged in a scheme to defraud with *one* alleged unnamed victim. [DE1:3-8]. The Complaint also alleged that

> [a]s part of that scheme, STANLEY and GUY lured the Victims, who were nearly all elderly individuals, into purported romantic or close personal relationships through in-person meetings, phone calls, text messages, and an online dating platform. After earning the Victims' trust, STANLEY and GUY convinced the Victims to transfer money to STANLEY and GUY under false pretenses, including by, among other things, falsely representing that STANLEY and GUY needed money for fake businesses and organ transplants.

[DE1:3].

---

[8] At the February 5, 2025 Conference, Assistant United States Attorney Phillips represented to the Court that Guy and Stanley had defrauded 15 victims.

On January 22, 2025, Guy and Stanley were indicted. Counts 1-3 of the Indictment factually allege that Guy and Stanley, individually or in concert with each other, "engaged in a scheme to induce elderly victims to transfer funds to [them], under false pretenses." [DE30:1-3].[9] However, these counts fail to allege: 1) that false pretenses were material or that Guy and Stanley intentionally lied "to induce elderly victims to transfer funds" to them;" or 2) the identity of the alleged victims. The insufficiency of these charges are the subjects of a pending motion to dismiss.

On February 14, 2025, Guy and Stanley filed a motion for a bill of particulars requesting disclosure of the identity of the unnamed victims. [DE39]. In opposition, the Government represented that it would "timely provide the defense with victim identities and victim statements, among other information, prior to trial, in accordance with its obligations under *Giglio v. United States*, 405 U.S. 150 (1972), and 18 U.S.C. §3500." [DE47:7]. On April 11, 2025, this Court denied the defendants' motion for bill of particulars but deferred their identification until prior to trial "in view of the vulnerable nature of the victims who were allegedly defrauded." [DE61:7].

---

[9] Count 4 does not allege any facts specifying what Guy and Stanley are accused of doing other than laundering money derived from the proceeds of the criminal activity alleged in Counts 1-3.

On May 23, 2025, the Government provided defense counsel via email a master victim list which "show[ed] each enumerated victim as they are identified in the discovery documents, the legal process produced in discovery, and our current estimated victim loss amounts for each of the defendants' direct victims…." The victim in that chart identified as victim #12 was previously denoted as victim #1 in GPS Combo Warrants 24 MAG 1663 and 24 MAG 2203. The Government represented that, as to all the victims listed in the chart (#'s 1-15), they had "identified material misstatements made by Guy (and/or Stanley) that caused each of the victims to give money or property and/or advanced the fraudulent scheme" and "that each of the victims had a financial and/or property loss."

However, in early July 2025, counsel for Guy advised the Government via email that he could not locate alleged false statements made by the defendants to 9 out of the 15 unnamed numbered victims (including victim #12) after having previously indicated to the Government that a review of discovery, including the Complaint, affidavits in support of search warrants/pen registers, 302 report, and video, uncovered alleged false statements for only alleged victims #'s 1, 3, 5, 6, 7, 15. Consequently, counsel for Guy made inquiries of the Government via email to answer questions about locating the false statements in discovery but could not obtain direct responses. Frustrated with the Government's evasiveness, counsel for

Guy on July 10, 2025 sent via email the following three questions, inserting what counsel for Guy believed were the Government's positions, and asked the Government to confirm if those answers were accurate:

1. Can you please advise where in the discovery that you have provided the alleged false statements for the other 9 unnamed victims are located?

   **The alleged false statements made by the defendants to the other 9 unnamed victims are either contained in the discovery the Government has provided (but the Government will not assist the defense to locate) and/or the Government will not disclose those statements to the defense until it provides *Jencks* materials.**

2. If those statements are not included in discovery, can you please advise when you can provide them to the defense?

   **The Government will not disclose those statements made by the defendants to the other 9 unnamed victims to the defense until it provides *Jencks* materials.**

3. If it's the Government's position that it does not want to disclose the alleged false statements for the other 9 unnamed victims until it provides *Jencks* materials right before trial, please let me know, and the reasons for that.

   **The Government believes that the defense is not entitled to obtain those statements made by the defendants to the other 9 unnamed victims until the Government provides them pursuant to the *Jencks* disclosure timeline.**

In response, the Government on July 11, 2025 sent an email to counsel for Guy advising that "[i]t appears you understand our position on these issues."

### III.    Grounds may exist to dismiss the indictment because of matters that occurred before the Grand Jury

### A. Misconduct regarding victim #12

Notwithstanding the Government's representation to defense counsel that it had "identified material misstatements made by Guy (and/or Stanley) that caused each of the [15 listed] victims to give money or property and/or advanced the fraudulent scheme," Guy and Stanley dispute that any evidence exists that Guy made any such material misstatements with respect to victim #12 because 1) victim #12 passed away in 2020, 2) the Government did not commence its investigation of Guy and Stanley until 2023, and 3) the Government's discovery has not revealed the existence of any statements made by Guy that induced victim #12 to give or transfer any funds to her. Although the affidavits for GPS Combo Warrants 24 MAG 1663 and 24 MAG 2203 generally allege that Guy and Stanley "developed a relationship with and gained their victims' trust, made false representations about the Target Subjects' need for money, and instructed their victims to transfer funds from the victims' bank accounts to the Target Subjects' bank accounts, provide the Target Subjects with cash, and/or write checks issued in the Target Subjects' names," it is telling that neither affidavit nor other discovery provided by the Government attributes any false statements or false pretenses to Guy or Stanley with respect to victim #12.

Unless the Government possesses evidence undisclosed to defense counsel that shows that Guy made material fraudulent statements to induce victim #12 to give her money, then the Grand Jury was certainly mislead to believe that evidence existed that the victim identified as victim #12 was lured to give Guy money by material false statements or false pretenses. *Cf. **United States v. Leibowitz***, 420 F.2d 39, 42 (2nd Cir. 1969) ("If the grand jury is misled into thinking it is getting eye-witness testimony from the agent whereas it is actually being given an account whose hearsay nature is concealed … dismissal may be considered."). Under the latter scenario, Guy and Stanley would be entitled to grand jury testimony which referred to victim #12 by name or otherwise, or generally included victim #12 as among the "elderly victims" of the defendants' fraudulent scheme, or that victim #12 was not included as one of the "elderly victims" which formed the bases of the indictment, in order to support a motion to dismiss the indictment. If the circumstances surrounding victim #12 were not properly considered or presented to the Grand Jury, such failure would constitute facts not found by, and … not even presented to, the grand jury which indicted h[er]." ***Russell v. United States***, 369 U.S. 749, 770 (1962)). Such testimony by any law enforcement officer to the Grand Jury that would lead them to believe something untrue would also constitute discoverable exculpatory materials under ***Brady***, ***Giglio*** and ***Bagley***.

13

**B. Failure to name or identify all the alleged elderly victims**

The Grand Jury's indictment only identified the alleged victims as "elderly victims." If, for example, the Government only presented evidence to the Grand Jury that Guy and Stanley lured "elderly victims" to transfer money to them by false pretenses, or identified the alleged victims by name or number, but the Government chose to present the Grand Jury with an indictment for their review which only alleged that the victims were "elderly," that would violate the Fifth Amendment Indictment Clause's requirement that an indictment contain some amount of factual particularity to prohibit the "prosecution [from later filling] in elements of its case with facts other than those considered by the grand jury." *United States v. Walsh,* 194 F.3d 37, 45 (2nd Cir. 1999).

While the Grand Jury chose to only allege that Guy and Stanley engaged in a scheme to "induce *elderly victims* to transfer funds to wire fraud charges," those charges have left the defendants guessing as to how many persons were alleged to be victims during Grand Jury proceedings, and how many, if any, were identified by name. If the Government failed to name or identify any alleged victim during Grand Jury proceedings, disclosure will be necessary not only in support of the already-filed motion to dismiss but to foreclose the Government from presenting evidence concerning those alleged unnamed victims at trial.

14

### C. Failure to identify material false statements made by Guy and Stanley to lure all the alleged victims to transfer funds to them before the Grand Jury

That the Government failed to provide such information about victim #12 gives the defendants pause about whether they similarly failed to furnish the Grand Jury with material false statements or false pretenses regarding other alleged victims. What makes defense counsel believe that, contrary to its representation, the Government does not have evidence of material false statements made by Guy and Stanley to lure at least 9 alleged victims to give them money (and did not offer such proof to the Grand Jury regarding numerous alleged victims) is not only evidenced by the Grand Jury's failure to allege that Guy and Stanley committed the wire fraud charges through *material* false pretenses,[10] but the Government's refusal to assist defense counsel to identify or locate those statements in discovery purportedly because they erroneously characterize them as *Jencks* materials.

Based on the indictment, the Government's theory of prosecution erroneously appears to be that evidence that Guy or Stanley received any money

---

[10] In a motion to dismiss the indictment separately-filed by Guy and Stanley, one of the grounds alleged is that Counts 1-3 of the indictment charging wire fraud fail to allege that Guy or Stanley made any material representations that "a reasonable person would attach importance to it in deciding how to proceed," *Kousisis v. United States*, 605 U.S. at 131, or alternatively allege what representations they made that were material.

from "elderly victims" without proof that they made material false statements to obtain money is sufficient to sustain convictions for wire fraud and money laundering charges. While *Jencks* precludes disclosure of witnesses' statements until after they testify at trial, material false statements made by Guy or Stanley to any alleged victim are not covered by *Jencks* and are not only discoverable, but had to be presented for the Grand Jury's consideration as to each alleged victim in order to return a valid indictment. Thus, even if an alleged victim was properly identified as such before the Grand Jury, disclosure of Grand Jury minutes evincing whether false material statements made by Guy and Stanley with respect to each identifiable victim was presented to the Grand Jury would support a motion to dismiss and/or limit the Government's proof at trial.

### D. Government witnesses' inflammatory and prejudicial references to "pig butchering schemes" perpetuated through "romance scams"

Guy and Stanley submit that they should have access to Grand Jury minutes to determine whether comments similar to those made by Smythe in his affidavits in which he described the defendants' fraudulent schemes involving elderly victims as "pig butchering schemes"[11] perpetuated through "romance scams" were

---

[11] A pig butchering scheme "involves cultivating a friendly or romantic relationship with a potential victim through continuous and repeated contacts to "fatten up" victims with falsehoods, gain their trust, and eventually solicit them to

16

made by witnesses before the Grand Jury which were so inflammatory as to render fundamentally unfair the return of the indictment against them. Not only are those characterizations in Smythe's affidavits not supported by facts therein or otherwise, but equating the images of pigs being butchered with the financial crimes allegedly committed by Guy and Stanley against "elderly victims" – grisly, lingering depictions which are difficult to set aside -- could only serve to create a bias against the defendants and prejudice the Grand Jury in evaluating the evidence presented to them. *See*, *e.g.*, ***United States v. Hogan***, 712 F.2d 757, 761 (2nd Cir. 1983) (underlying indictment dismissed where the appeals court found, among other reasons, that "the impartiality and independent nature of the grand jury process was seriously impaired [and fundamentally unfair] by the AUSA's argument that Hogan was a real hoodlum who should be indicted as a matter of equity"); ***United States v. Serubo***, 604 F.2d 807, 818-19 (3rd Cir. 1979) (appellate court characterized "the prosecutor's misconduct [as] extreme," finding that "the graphic and misleading reference to Cosa Nostra hatchet men, for example, was a blatant invitation to associate the defendants with a disfavored criminal class appellate court," and remanded case to permit the defendants to determine … [i]f

---

invest in a fraudulent financial opportunity." ***Commodity Futures Trading Commission v. Debiex***, 2025 WL 786508, *1 (D.Az).

17

the [referred] improprieties … infected the proceedings before the second grand jury" and "the indictment should be quashed.").

Moreover, generally claiming that these schemes in which victims are "butchered" through "romance" scams would be misleading in this case because the discovery provided by the Government does not reveal that the defendants presented themselves as romantically interested in any victim. To the contrary, in one of the voicemails the Government has provided to the defense in discovery in which Guy left on victim-2's answering machine, it unequivocally shows that Guy dismissed the existence of any possible romantic involvement with victim-2, or any misunderstanding he may have had. Specifically, in that message which Guy left on December 2, 2022, she is heard stating "we're not in a relationship" and "like I mentioned, we're friends."

Guy and Stanley submit that if Smythe and other Government agents repeatedly made these erroneous, prejudicial remarks to mislead a Magistrate Judge to issue warrants in this case, it is highly likely that the Government not only did not hesitate to do the same before the Grand Jury, but making those false, prejudicial remarks at the Grand Jury would have been even more highly inflammatory. Thus, disclosure of Grand Jury minutes showing whether Government witnesses cast unfounded, irrelevant aspersions about the defendants by preliminarily referring to the fraudulent schemes as "pig butchering" (and in turn labeling Guy and Stanley as

18

butchers) prejudiced the Grand Jury in their evaluation of the evidence presented as to each alleged victim, and if any evidence of a "romance scam" used by the defendants as to each victim was discussed before the Grand Jury, would constitute discoverable exculpatory materials under ***Brady***, ***Giglio*** and ***Bagley*** and support a motion to dismiss and/or limit the Government's proof at trial.

### E. Affiant falsely alleged in an affidavit that Guy enticed the victims to make investments

As with the unnecessary "pig butchering schemes" and "romance scams" descriptions by Government agents to vilify Guy and Stanley, the Affiant generally alleges that in affidavits that the "fraudsters entice their victims into making … *investments*." *Affidavit*, at 8 (emphasis added). However, the facts alleged in the narrative of victims 1 and 2 fail to indicate that Guy ever requested that either *invest* in any venture. The Government knew when they presented the affidavit to Magistrate Judge Cott that no evidence existed that Guy or Stanley enticed anybody into making investments. Instead, agents were aware that any transfer of funds were as a result of the alleged victims either gifting or loaning the funds to Guy or Stanley. Since Government agents were not hesitant to play fast and loose with facts they alleged in the affidavit presented to the Magistrate Judge, disclosure of the Grand Jury minutes would constitute discoverable exculpatory materials under ***Brady***, ***Giglio*** and ***Bagley*** and

19

reveal if they similarly misrepresented this or other facts to mislead the Grand Jury.

### F. Potential Government violations of the Fourth Amendment

A seizure warrant based on Smythe's March 27, 2024 affidavit is the subject of a separately-filed motion to suppress and request for *Franks* hearing because, among other reasons, Smythe: 1) mislead the Magistrate Judge by failing to disclose that the Government seized funds from a Santander Bank account jointly-held between Guy and an alleged victim 28 days prior to applying for a seizure warrant: 2) procured a seizure warrant contrary to a four-year old binding Second Circuit precedent which deemed such delay presumptively unreasonable requiring exclusion; 3) falsely alleged in the affidavit that Guy perpetuated a "romance scam;" 4) falsely alleged in the affidavit that Guy enticed the victims to make investments; and5) falsely concluded that Guy's actions with respect to victim-1 were consistent with a "pig butchering scheme."

If the Government presented evidence of this seizure to the grand jury and this Court finds that Guy's Fourth Amendment rights were violated, the indictment would be subject to dismissal because it would be tainted by the Government's misconduct.

### G. Conclusion

Guy and Stanley submit that they have demonstrated that the particularized need for disclosure they have shown for their specific requests are "greater than the need for continued secrecy and … structured to cover only material so needed."

***Douglas Oil Company of California v. Petrol Stops Northwest***, *supra.*

> The Court need not now determine whether any facts herein have been proven, or whether there is merit to any motion [filed or] yet to be filed. That task may lie ahead. Rather, the Court [should] find[] that the government's actions in this case—whether purposeful, reckless, or negligent—raise genuine issues of misconduct, are inextricably linked to the government's grand jury presentation, and deserve to be fully explored by the defense.

***United States v. Comey***, criminal number 1:25-cr-272-MSN-WEF, E.D.Va., Memorandum Opinion, docket entry 191.

Accordingly, Guy and Stanley request this Court to grant this motion for an *in camera* review and disclosure of grand jury minutes because grounds may exist to dismiss the indictment based on matters that occurred before the Grand Jury.

Respectfully submitted,

By: *William Castro*
William Castro
New York Reg. No. 2330074
Attorney for Defendant Guy
8724 S.W. 72 Street, #205
Miami, Florida 33173
Tel.: 305-898-3716
Fax: 305-598-2023
Email: wmcastronyatty@gmail.com

21

By: *Joseph R. Corozzo*
Joseph R. Corozzo
*Angela D. Lipsman*
Angela D. Lipsman
Rubinstein & Corozzo, LLP
Attorneys for Defendant Stanley
260 Madison Avenue, 22d Floor
New York, New York 10016
Tel.: 212-545-8777
Fax.: 917-722-8206
Email: jcorozzo@rubcorlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of February 2026, I electronically filed

the foregoing Motion with the Clerk of Court using the CM/ECF system.

*William Castro*
William Castro

22